(June 24, 1986)

■ LYNN CHRISTOPHER et al., Appellants, v ST. VINCENT'S HOSPITAL AND MEDICAL CENTER, Respondent, and ALBERT BURCHELL et al., Appellants, et al., Defendants.—Order, Supreme Court, New York County (Ira Gammerman, J.), entered August 15, 1985, which granted the motion of defendant-respondent St. Vincent's Hospital and Medical Center for summary judgment dismissing the complaint against it, reversed, on the law, without costs, and the motion for summary judgment is denied.

In a medical malpractice action for damages sustained as a result of a cardiac arrest in the course of an operation, the plaintiffs and two of the doctor defendants, Drs. Burchell and Keyloun, appeal from an order of the Supreme Court granting the motion of the defendant St. Vincent's Hospital and Medical Center (St. Vincent's) for summary judgment dismissing the complaint against it.

The events with which we are concerned started on June 29, 1977, when an appendectomy was performed on the plaintiff Lynn Christopher at St. Vincent's by Dr. Burchell, a surgeon who was requested to do so by plaintiff's long-standing physician, Dr. Keyloun. After a routine operation, free from complications, the plaintiff was discharged by Dr. Burchell on July 6, 1977.

On July 11, 1977, the plaintiff was readmitted to St. Vincent's by Dr. Burchell with a diagnosis of thrombophlebitis in the left thigh. Pursuant to the orders of Dr. Burchell, who assumed care of the plaintiff in the absence of Dr. Keyloun, then on vacation, a course of intravenous administration of Heparin was commenced. On July 18, 1977, the plaintiff's care was transferred to Dr. Keyloun, who had just returned from vacation. In accordance with the recommendation of Dr. Stutman, a hematologist on the hospital staff, Dr. Keyloun ordered an increase in the amount of Heparin administered to plaintiff. On July 20, 1977, again in accordance with Dr. Stutman's recommendations, Dr. Keyloun changed the anticoagulant to Coumadin. The plaintiff's condition apparently becoming exacerbated during the period of Coumadin therapy, Dr. Keyloun directed a return to the use of Heparin.

Apparently having concluded that Heparin therapy would be required over an extended period of time, and that this could be appropriately administered by plaintiff and her husband at home, both having been instructed in its administration, Dr. Keyloun arranged for the plaintiff's discharge on August 1, 1977, with instructions to plaintiff and her husband to administer a total of 20,000 units a day under the skin. On August 2, 1977, the day following her release, the plaintiff was received at the hospital emergency room with complaints of severe chest pain, blackouts and convulsions. Her condition was diagnosed as massive pulmonary embolus secondary to left ileofemoral thrombophlebitis, that is, emboli had broken off from the clot in her thigh and lodged in plaintiff's lung. Plaintiff was admitted to St. Vincent's Intensive Care Unit.

On the afternoon of August 4, 1977, the emboli disrupted and scattered through plaintiff's lungs, requiring open-heart surgery to remove the clots and to insure against further dislodgement. Surgery was performed that day by two cardiovascular surgeons, Drs. Bonfils-Roberts and Gianelli. It was in the course of that surgery that plaintiff sustained a cardiac arrest resulting in brain damage due to lack of oxygen. This action followed in which, as clarified by the papers submitted on the motion, the principal theory of liability advanced by the plaintiffs was that anticoagulation therapy had been improperly and negligently administered, plaintiff never having been restored to a therapeutic range.

In support of St. Vincent's motion for summary judgment dismissing the complaint as to it, it was asserted in an affidavit by its lawyer that at all relevant times plaintiff had been in the care of private attending physicians, and that the hospital personnel at all times had acted in accordance with the instructions of plaintiffs' privately retained physicians.

In plaintiffs' responding papers, which included submission of the hospital record, an affidavit was submitted by a qualified expert in which he concluded, on the basis of a study of the hospital record, that St. Vincent's personnel had been guilty of malpractice in several respects in connection with the anticoagulation therapy that had been administered. He stated that at no time during plaintiff's stay at St. Vincent's had an effective state of anticoagulation been established, and that it had been a departure from accepted medical practice not to increase the dosage of anticoagulant based upon the demonstrated absence of anticoagulant status. He further concluded that it was malpractice for the hospital to have allowed the plaintiff to be out of bed and walking during her

stay at the hospital, and that at various times the hospital had departed from approved practice by failing to conduct anticoagulation studies, known as APTT, some 30 minutes before each scheduled time of administration of Heparin.

St. Vincent's motion for summary judgment was also opposed by Drs. Burchell and Keyloun. In an affidavit submitted by Dr. Keyloun, he stated that he was informed by two hospital residents present in the operating room during the course of the operation, Drs. Nkongho and Kramer, that there had been a failure of the heart-lung machine, which deprived plaintiff of blood circulation to her brain leading to cerebral dysfunction.

In granting St. Vincent's motion for summary judgment dismissing the complaint, Special Term preliminarily concluded that the statements attributed to the two hospital residents by Dr. Keyloun were inadmissible hearsay and therefore insufficient to raise a factual question as to whether plaintiff's condition was caused by equipment failure. As to plaintiffs' principal thesis, Special Term held that at all times during her stay plaintiff was in the charge of her private attending physicians and that the hospital could not be found liable for actions by its personnel which were in accordance with instructions given by plaintiff's attending physicians, and in all respects approved by them. Finally, with regard to the omission on at least one date to conduct APTT studies, the court decided that no basis for the hospital's liability could be found in those omissions because Dr. Keyloun had testified in a deposition that the studies would not have affected the course of treatment.

Although aspects of the issues presented on this appeal raise troublesome questions, we are persuaded that the record as a whole fails to establish St. Vincent's freedom from liability as a matter of law, and have accordingly determined that the granting of its motion for summary judgment should be reversed, and that the motion should be denied.

As to Dr. Keyloun's claim that hospital residents had informed him of a failure in hospital equipment, we believe that it was premature under the circumstances to conclude that this purported statement would not be admitted into evidence and therefore did not give rise to a factual issue. The information presented seems to us insufficient at this point to permit a clear determination as to whether the statement would ultimately be admissible. Under the circumstances presented, we think the preferable approach is that set forth by the Court of Appeals in *Friends of Animals v Associated Fur Mfrs.*

(46 NY2d 1065, 1068), in which it was observed that the requirement on a motion for summary judgment of evidentiary proof in admissible form "is more flexible, for the opposing party, as contrasted with the movant".

No doubt Special Term may have been influenced by the circumstance that in the deposition of the surgeon performing the operation, Dr. Bonfils-Roberts, the doctor, himself a defendant, in his detailed account of the events surrounding the cardiac arrest appeared to negate the possibility that machine failure contributed to what had occurred, and may have found this sworn testimony by someone whose interest was adverse to the hospital to be more persuasive than statements belatedly attributed by a defendant doctor to hospital residents who were never deposed and apparently were not expected to be witnesses at the trial. These considerations, however, clearly go to the probative weight of that which was presented, not to whether or not a factual issue is presented.

Turning to the principal issue presented by plaintiffs' action and St. Vincent's motion for summary judgment, the most recent statement of the applicable rule by the Court of Appeals was set forth in *Toth v Community Hosp.* (22 NY2d 255). In a case primarily concerned with a claim that hospital personnel had departed from the instructions of an attending physician, the Court of Appeals observed (at p 265) that "a hospital is normally protected from tort liability if its staff follows the orders" of the attending physician, but went on to state in a footnote comment (p 265, n 3): "An exception to the rule would exist where the hospital staff knows that the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders (see, generally, *Fiorentino* v. *Wenger,* 19 N Y 2d 407, 414-415)." When considered together with *Fiorentino v Wenger,* the authority referred to in *Toth,* we think it probable that the rule set forth in *Toth* was intended to apply as well to a situation in which hospital personnel should have known that the physician's orders were clearly contraindicated.

Applying the *Toth* formulation to the situation presented, we observe preliminarily that the rule set forth in *Toth (supra)* seems to us an effort to accommodate in a realistic way two important but different values implicit in the relationship between an attending physician and a hospital staff.

On the one hand it seems clear that in the ordinary situation hospital personnel are obligated to carry out the instruc-

tions of a privately retained attending physician, and have a right to do so without any apprehension that liability will thereby follow. The dangers to proper medical care inherent in contradictory actions being taken by the attending physician and hospital personnel are too obvious to require any extended discussion. On the other hand, it is difficult to believe that hospital personnel who know, or should know, that the course of treatment prescribed is clearly contraindicated by accepted medical practice may appropriately carry out the clearly contraindicated course of treatment without taking any action whatever, even if that action consists simply of informing the attending physician of their concerns.

The affidavit submitted in this case by plaintiffs' expert is clearly sufficient to present a factual issue as to whether aspects of the anticoagulation therapy constituted malpractice. Although it is less certain that the treatment pursued was "clearly contraindicated by normal practice", and indeed the affidavit does not speak in such terms, we are persuaded that the affidavit is sufficient to raise a factual issue as to the hospital's liability, requiring denial of its motion for summary judgment. This conclusion receives some support in parts of the hospital record that indicate that hospital personnel had some discretion in the administration of the anticoagulation therapy.

As to the hospital's alleged failure to conduct anticoagulation studies in accordance with good and accepted medical practice, we acknowledge that Dr. Keyloun's deposition testimony that these omissions would not have affected his course of treatment makes it doubtful that the omissions could be evaluated as having caused that which eventually occurred. However, the issue of causation is normally a jury question, and we are not persuaded that Dr. Keyloun's deposition testimony is sufficient to establish the absence of proximate cause as a matter of law. Concur—Murphy, P. J., Sandler, Lynch, Kassal and Wallach, JJ.